## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| DANIEL PERRY, on Behalf of Himself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>CIGNA CORPORATION, CIGNA HEALTH AND LIFE INSURANCE COMPANY, and OPTUMRX, INC.,<br><br>Defendants. | Civil Action No.: _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Daniel Perry ("Plaintiff"), by and through the undersigned counsel for his Class Action Complaint against Defendants Cigna Corporation, Cigna Health and Life Insurance Company (collectively, with Cigna Corporation, "Cigna"), and OptumRX, Inc. ("OptumRX" and collectively, with Cigna, "Defendants"), states and alleges as follows:

### INTRODUCTION

1.      Plaintiff, on behalf of himself and all others similarly situated, brings this action against Defendants to recover monetary damages, injunctive relief, and other remedies resulting from Defendants' common fraudulent and deceptive pricing scheme to artificially inflate prescription copayment amounts ("copayment" or "copay") causing consumers to pay more than they otherwise would on purchases of medically necessary, covered prescription drugs.

2.      About 90% of all United States citizens are now enrolled in private or public health insurance plans that cover some, or all, of the costs incurred for medical and pharmaceutical benefits.  A feature of most of these plans is the shared cost of prescription drugs. Normally, when a plan participant fills a prescription for a medically necessary, covered prescription drug under his or her health care plan, the plan pays a portion of the cost and the

plan participant pays the remaining portion of the cost directly to the pharmacy in the form of a copayment or coinsurance.  Merriam-Webster defines a copayment as "a small fixed fee that a health insurer (as an HMO) requires the patient to pay for certain covered medical expenses (as office visits or prescription drugs)."[1]  Pharmacies are required by contract to collect the copayment on Defendants' behalf from the plan participant at the time the prescription is filled and are not allowed to waive or reduce the copayment collected.

3.     Defendants are health insurance companies, along with a pharmacy benefit manager ("PBM"), that provide and administer health and pharmacy benefits to insureds.  The PBM is retained by Cigna, on behalf of the plan or third-party payors, to provide pharmacy benefits to plan members, which includes, *inter alia*, establishing a formulary of drugs that will be covered, a network of pharmacies that will serve as participating pharmacies for plan participants to obtain their prescriptions, copayment amounts, coinsurance amounts, and deductibles (if applicable).  In this instance, Cigna has retained OptumRX for all of its PBM services, having previously entered into a 10-year PBM services agreement with Catamaran Corporation, which was acquired in 2015 by OptumRX.[2]

4.     According to Cigna's Form 10-K, under the PBM services agreement, Cigna "utilize[s] Optum's technology and service platforms, retail network contracting and claims processing services."  *Id.*

5.     As set forth below, Defendants and their co-conspirators, which include other insurance companies who utilize OptumRX, have engaged in a scheme to defraud plan members

---

[1]     *See Co-payment*, MERRIAM-WEBSTER (2016), http://www.merriam-webster.com/ dictionary/co%E2%80%93payment (last accessed Nov. 17, 2016).

[2]     Cigna Corp., Annual Report at 2 (Form 10-K) (Feb. 25, 2016), https://www.sec.gov/ Archives/edgar/data/701221/000104746916010432/a2227373z10-k.htm (last visited Nov. 17, 2016).

by artificially inflating the copayment of medically necessary prescription drugs well above the cost of the drug. Plan participants, including Plaintiff and the Class (defined below), pay inflated copayments to participating pharmacies in exchange for receiving their prescription drugs. Unbeknownst to the plan participants, Defendants artificially inflate the purported costs of the prescription drugs in the form of increased copayments and then "claw back," or recoup, from the pharmacies a large portion of the copayments.

6.      Defendants utilize U.S. Mail and interstate wire facilities to engage in their fraudulent billing scheme. Defendants represent to plan participants that their copayment amount is based on some portion of the actual cost for the drug, when, in fact, plan participants pay more than the actual cost of the drug and Defendants simply pocket the overpayment in the form of prescription claw back. Defendants represent to the pharmacies that they are clawing back the increased copayment amount because consumers overpaid for their prescriptions. However, Defendants never disclose this to plan participants, nor do they reimburse plan participants for their supposed overpayments. The amounts Defendants claw back from the copayments are pure, undisclosed profit for Defendants.

7.      The costs incurred by plan members resulting from Defendants' fraudulent scheme can be significant. For example, when a consumer pays a $10 prescription copayment to the pharmacy for a medically necessary, covered prescription drug, as required under the consumer's health benefit plan, the acquisition cost of the drug may be only $3. The PBM then reduces the pharmacy's reimbursement for the claim for this prescription by $6 as an adjustment to the original claim. In this scenario, the PBM has "clawed back" $6 of the $10 copay. Ultimately, the pharmacy is reimbursed $4 (all from the consumer copayment), making only $1

over the cost of the drug, while the Defendants fraudulently retain $6 – which they do not pass back to the plan participant.

8.      In order to implement Defendants' fraudulent scheme, Defendants' contracts with participating pharmacies require the pharmacists not to disclose the existence of the claw back or the fact that a plan member could, in certain circumstances, pay more as a copayment for a prescription drug than if the plan member did not have insurance.  Pharmacies are often subject to "gag clauses" in their contracts, prohibiting them from advising plan participants that he or she could pay less for a drug if the purchase is made without applying the pharmacy insurance benefit.

9.      Defendants' fraudulent scheme to artificially inflate the copay for medically necessary, covered prescription drugs, and then surreptitiously retaining those excess amounts, jeopardizes the entire pharmaceutical delivery system.  For one, consumers are paying higher amounts than they otherwise would had Defendants not artificially inflated the copayment amounts; as for many of these drugs, the cost without insurance would be only slightly over the acquisition cost.  Therefore, consumers believe that they are saving money through the use of their pharmacy benefit, when, in reality, they have been charged an excessive amount for the prescription.  The pharmacy believes that it is being reimbursed a reasonable amount for the prescriptions it fills for consumers, only to have a large portion of it clawed back by Defendants.  And, the plan participant believes he or she is paying a copayment based on the prescription drug's true cost, but instead is paying an inflated cost for the prescription.

10.      Class members are consumers who pay artificially inflated copayments for medically necessary, covered prescriptions that cost plan participants more than if they did not have insurance.  Indeed, the very purpose of obtaining insurance and having pharmacy benefits is

to enable plan members to receive the purported benefits of the insurance company and PBMs through the insurance company's and PBMs' negotiating and buying power with prescription drug manufacturers, which is supposed to result in reduced costs for prescription drugs, costs for administration, and overhead of their pharmacy benefit.

11.     As a result of Defendants' fraudulent scheme, Defendants overcharged Plaintiff and the other Class members for prescription drugs during the Class Period (defined below). Defendants' misconduct has caused Plaintiff and the other Class members to suffer significant damages.

## PARTIES

### A.     Plaintiff

12.     Plaintiff Daniel Perry is a citizen of the State of Washington.  During the Class Period, Plaintiff participated in an individual health plan offered by Cigna, utilized Defendants' pharmacy benefit to obtain prescriptions for medically necessary, covered prescriptions, and paid copayments for such prescriptions.  As described in detail below, as a result of Defendants' fraudulent scheme, Plaintiff has been injured by paying inflated copayments for medically necessary, covered prescriptions.

### B.     Defendants

13.     Defendant Cigna Corporation is a global health services company.  Cigna Corporation is a Delaware corporation with its principle place of business located at 900 Cottage Grove Road, Bloomfield, Connecticut 06002.

14.     Defendant Cigna Health and Life Insurance Company offers, among other things, health insurance products and services and network-based health and well-being services to beneficiaries and other government-sponsored health care programs.  Cigna Health and Life

Insurance Company is a Connecticut corporation with its principal place of business located at 900 Cottage Grove Road, Bloomfield, Connecticut 06002.

15.     Defendant OptumRX, Inc. is a wholly-owned subsidiary of UnitedHealth Group, Inc. with it with its principal place of business located at 9900 Bren Road East, Minnetonka, Minnesota 55343.  OptumRX provides pharmacy benefit solutions to Cigna and serves as a PBM for over 66 million individuals throughout the United States.   In March 2015, OptumRX acquired Catamaran Corporation.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction pursuant to 28 U.S.C. §1331, as claims are brought under federal statutes and necessarily involve adjudication of one or more federal questions. This Court also has jurisdiction pursuant to 18 U.S.C. §1964(a), which states that the "district courts of the United States shall have jurisdiction to prevent and restrain violations of section 1962."

17.     This Court also has jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. §1332(d)(2), (5), because: (i) the Class has more than 100 members; (ii) the amount at issue exceeds five million dollars, exclusive of interest and costs; and (iii) minimal diversity exists, as Plaintiff and Defendants are citizens of different states.

18.     This Court has personal jurisdiction over Defendants because Defendants conduct business in this District, have their principle executive offices and provide prescription drug services in this District, have advertised, marketed, and promoted their services in this District, and have sufficient minimum contacts within Connecticut and/or sufficiently availed themselves of the markets in Connecticut and this District to render the exercise of jurisdiction by this Court permissible.

19.     Venue is proper in this District under 28 U.S.C. §1391(a)-(d) because, *inter alia*, substantial parts of the events or omissions giving rise to the claim occurred in this District and/or a substantial part of property that is the subject of the action is situated in this District.

## FACTUAL BACKGROUND

### A.     Prescription Drug Coverage

20.     Over 90% of health care beneficiaries in the United States have a health care plan (either private or public) that covers all, or a portion of, their medical and pharmaceutical expenses.  Few plans cover all expenses, but instead, require plan participants to pay a portion of their drug costs out-of-pocket.   These out-of-pocket expenses include copayments, co-insurance, and/or deductibles.

21.     Even though plan participants cannot, and do not, negotiate the price charged by pharmacies for prescription drugs and do not negotiate the copayment price for the drug in a given transaction; they are required to pay the pharmacy a predetermined copayment amount in order to receive the prescription.

22.     Plan participants pay health insurance premiums, either directly or through an employer deduction, to a third-party payor for the purpose of insuring against healthcare costs, including prescriptions.

23.     A third-party payor ("TPP") is any organization, public or private, that pays or insures health or medical expenses on behalf of customers, members, and beneficiaries or their family members.  TPPs can include commercial insurance companies, self-insured employers, and multi-employer, Taft-Hartley health or welfare funds.

24.     PBMs serve as middlemen between drug manufacturers and/or pharmacies and the plans or TPPs that pay for drug prescriptions.  PBMs act as agents for the plans and the TPPs.

PBMs enter into contracts with plans and TPPs to provide programs designed to help maximize drug effectiveness and contain drug expenditures by influencing the behaviors of prescribing physicians, pharmacists, and members.   Accordingly, on behalf of plans and TPPs, PBMs provide numerous services, including developing a pharmacy network, formulary design, negotiating drug rebates, drug utilization review, and processing and analyzing prescription claims.

25.    In a typical situation, where a benefit plan participant seeks to fill a drug prescription, the role of the PBM is illustrated as follows: the insured consumer visits a network pharmacy; the pharmacy checks with the PBM to confirm consumer eligibility, coverage, and copayment information; the consumer pays the copayment (and any deductible) and purchases the drug; the PBM then reimburses the pharmacy for the remainder of the negotiated drug price, including the ingredient cost and a dispensing fee less the copayment; and the PBM then bills the plan member, or the TPP, for the payments it made, pursuant to the terms of the contractual agreement between the plan or TPP and the PBM.

**B.    How Prescription Drug Prices Are Set**

26.    The common pricing benchmark for virtually all retail drug reimbursement transactions is the "Average Wholesale Price" ("AWP").    The AWP represents the manufacturer's published catalog or list price for a drug product.    Commercial publishers of drug pricing data, such as Red Book and First DataBank, have published AWP data since the 1970s.    AWP is used to determine drug prices and third-party reimbursement throughout the healthcare industry.

27.    The AWP may be determined by several different methods.    The drug manufacturer may report the AWP to the individual publishers of drug pricing data.    The AWP

may also be calculated by the publishers based upon a mark-up specified by the manufacturer that is applied to the wholesale acquisition cost ("WAC") or direct price ("DP"). The WAC is the manufacturer's list price of the drug, when sold to the wholesaler, while the DP is the manufacturer's list price, when sold to non-wholesalers.

**C.     Defendants' Copayment Claw Back Scheme**

28.     Consumers purchase health insurance to protect them from unexpected high medical costs, including prescription drug costs. Plan participants, including Plaintiff and the Class, at a minimum, expect to pay the same prices or better than uninsured or cash-paying individuals for a prescription. Otherwise, they not only would receive no benefit from their insurance plan, but also would, in fact, be punished for having insurance. Therefore, plan participants reasonably expect to pay less for prescription drugs than cash-paying customers who do not have insurance coverage.

29.     Plaintiff is enrolled in an individual health plan that is written by Defendant Cigna Health and Life Insurance Company. Plaintiff's health plan is contained in a standard form contract that provides a pharmacy benefit for outpatient prescription drugs.

30.     Plaintiffs' plan contains a standard definition of "Covered Expenses," with respect to prescription drugs, which states:

> If you or any one of your Dependents, while insured for Prescription Drug Benefits, incurs expenses for charges made by a Pharmacy, for Medically Necessary Prescription Drugs or Related Supplies ordered by a Physician, CIGNA will provide coverage for those expenses as shown in the Schedule. Coverage also includes Medically Necessary Prescription Drugs and Related Supplies dispensed for a prescription issued to you or your Dependents by a licensed dentist for the prevention of infection or pain in conjunction with a dental procedure.[3]

---

[3]     Hamilton Affiliates: Open Access Plus Medical Benefits (rev'd May 23, 2012), printed May 2012 at 32.

31.     Plaintiff's health plan further provides that he is responsible to pay the applicable copayment with respect to medically necessary, covered prescription drugs: "Coverage for Prescription Drugs and Related Supplies purchased at a Pharmacy is subject to the Copayment or Coinsurance shown in the Schedule, after you have satisfied your Prescription Drug Deductible, if applicable. Please refer to the Schedule for any required Copayments, Coinsurance, Deductibles or Maximums if applicable." *Id*. at 33.

32.     Plaintiff's plan contains a standard definition of "Copayments," which is defined as "expenses to be paid by you or your Dependent for Covered Prescription Drugs and Related Supplies." *Id*. at 30.

33.     The plan further provides a prescription drug benefits schedule, which states: "This plan provides Prescription Drug benefits for Prescription Drugs and Related Supplies provided by Pharmacies as shown in this Schedule.  To receive Prescription Drug Benefits, you and your Dependents may be required to pay a portion of the Covered Expenses for Prescription Drugs and Related Supplies.  That portion includes any applicable Copayment." *Id*.

34.     In the Prescription Drug Benefits Schedule, a chart explains the copayment amount for each drug tier. *Id*.

35.     Plaintiff and other plan participants are not informed that they will be paying a copayment that will be higher than the actual cash price of a prescription.  However, contrary to these contractual provisions, Defendants have engaged in a fraudulent scheme to artificially inflate copayment prices and then subsequently claw back, or recoup, a substantial portion of the copayment, resulting in Plaintiff and the Class paying not just a percentage of the drug, rather than, in many instances, paying the full price, or more than the full price, of the drug.

36.     A copayment is a type of insurance payment where the insured pays a specified amount that is usually a fraction of the total costs with the insurer paying the remaining costs. Copayments are usually a set amount based on the type of prescription drug.  Prescription drugs are usually tiered according to price.  For example, a three-tier prescription drug plan may require higher copays for each tier.  Thus, with a three-tier copay plan, a consumer may pay a $10 copay for a Tier 1 categorized prescription drug, a $30 copay for a Tier 2 categorized prescription drug, and a $50 copay for a Tier 3 categorized prescription drug.  The tiering of copays is standard in insurance policies and normally reflective of the costs for the prescription drugs, *i.e.*, the higher the cost of the drug, the higher the copay.  However, evidence from numerous pharmacies show that Defendants are charging inflated copays that exceed the costs of the drugs.

37.     Here, Plaintiff's plan states that copayments and coinsurance are determined based on the level or tier to which the prescription drug, through Defendants' Prescription Drug Management Committee, has been assigned.  The plan states that, for participating pharmacies, the benefit for a Tier 1 prescription drug will be "No charge after $10 copay."  *Id*.  The plan states that the benefit for a Tier 2 prescription drug will be "No charge after $30 copay."  *Id*. The plan states that the benefit for a Tier 3 prescription drug will be "No charge after $50 copay."  *Id*.

38.     Plaintiff has been a victim of Defendants' prescription drug claw back scheme. Specifically, during the Class Period, Plaintiff has paid copayments for medically necessary, covered prescription drugs at his local pharmacy, while Defendants have improperly inflated the

price of the prescription drug copayment and then clawed back a portion of the copayment charged to Plaintiff.[4]

39.    On March 4, 2016 and April 6, 2016, Plaintiff filled prescriptions at his local network pharmacy for a medically necessary, covered drug.  The pharmacy submitted the prescription drug claims and Defendants adjudicated the claim, requiring the pharmacy to charge Plaintiff a $6.99 copayment for each prescription.  However, unbeknownst to Plaintiff, Defendants, through OptumRX, artificially inflated the cost of the prescriptions and clawed back approximately $3.65 of each copayment from the pharmacy.

40.    On July 18, 2015 and August 14, 2015, Plaintiff filled prescriptions at his local network pharmacy for a medically necessary, covered drug.  The pharmacy submitted the prescription drug claims and Defendants adjudicated the claim, requiring the pharmacy to charge Plaintiff a $7.15 copayment for each prescription.  However, unbeknownst to Plaintiff, Defendants, through OptumRX, artificially inflated the cost of the prescriptions and clawed back approximately $3.81 of each copayment from the pharmacy.

41.    As demonstrated above, Defendants have engaged in a fraudulent scheme to inflate prescription copayments significantly above the amounts for the cost of the drugs. Defendants have required pharmacies to collect these inflated copayments and then claw back, or recoup, a portion of the copayments that the pharmacies collected.

42.    Neither the copayment amount paid by the plan participant nor the amount clawed back by the PBM appears to have any relationship to the contractual provisions of the plan, AWP, wholesale price, WAC, or any other terms of reimbursement from a PBM.

---

[4]    To protect Plaintiff's privacy, Plaintiff is not providing the specific prescription drugs that were submitted to Defendants, as Defendants already possess such information.  To the extent requested, Plaintiff will provide such information to the Court and Defendants under seal.

43.     Plaintiff's investigation reveals that Defendants' claw back scheme is pervasive and is occurring with numerous prescription drugs, including Atovastatin, Azithromycin, Citalopram, Diazepam, Fluticasone, Meloxicam, and Proair Hfa.

44.     Another instance of Defendants' claw back scheme is shown through the following document image regarding a prescription for Vitamin D, which is used to treat certain calcium and phosphorus.  This image demonstrates how the claw back works.  It shows the cost of the drug, including tax and the pharmacist's fee, is $2.36, but also reveals that Cigna required that the pharmacy had to charge the customer a copayment of $7.68.  The image shows that $5.11 was sent back to the insurance company's PBM.  The image below describes how Cigna claws back a significant portion of the copay.[5]



45.     In response to the disclosure of the claw back practice, Louisiana Insurance Commissioner, James J. Donelon stated: "You could say that, if the customer is paying more

---

[5]     *See* Lee Zurik, *Copay or you-pay? Prescription drug clawbacks draw fire*, Fox8Live.com (May 4, 2016, 3:10 PM), http://www.fox8live.com/story/31891070/ zurikcopayoryoupayprescriptiondrugclawbacksdrawfire (last visited Nov. 17, 2016).

than the drug is worth, it' not a copay – it's a 'you-pay'. 'There's no copay,' our pharmacist says, 'that is an absolute, additional premium being paid, that they're paying, that they don't realize.'" *Id.*

46.    In these instances, instead of a traditional copayment based on the actual cost of the prescription drug, patients, like Plaintiff and the Class, are unknowingly footing the entire bill for their prescriptions, whereas Defendants pay nothing and make a sizable undisclosed profit off of the consumers.

47.    Unfortunately, plan participants often do not know the true costs of their prescriptions or that there are cheaper options available.    And, many pharmacies are contractually prohibited from letting plan participants know about less expensive options.

48.    Defendants' fraudulent copayment claw back scheme results in plan participants paying more for the cost of a prescription with insurance – which defeats the entire purpose of having insurance in the first place.    Defendants do not disclose their scheme to plan participants and, in fact, disguise their scheme through contractual provisions, which make it appear that their copayments are based on, and are a portion of, the cost of the prescriptions.    Indeed, there is simply no legitimate basis for Defendants to charge for more for medically necessary, covered prescription drugs than those without insurance.

49.    Defendants' contracts with participating pharmacies require the pharmacists not to disclose the existence of the claw back or the fact that a plan member could, in certain circumstances, pay more in a copay for a prescription drug than the drug would cost the plan member if he or she did not have insurance.    Pharmacies are often subject to "gag clauses" prohibiting them from advising consumers that he or she could pay less for a drug if the purchase was made without applying the insurance benefit.

50.     According to Doug Hoey ("Hoey") of the National Community Pharmacists Association ("NCPA"), a pharmacist sent him a letter received from OptumRX, one of the four largest PBMs in the United States.  Hoey stated that the letter from "Optum scolded the pharmacist," stating that OptumRX had "'recently discovered that pharmacy advised members that utilizing a cash price for their prescription is a better deal than using their insurance benefits.'"[6] OptumRX further stated in the letter that "telling customers a cheaper price exists is a 'violation of the agreement,' [with OptumRX]," that Optum 'takes these matters very seriously[,]' and that 'failure to timely comply with this notice could result in further disciplinary action, up to and including termination from all Optum pharmacy networks.'"  *Id*.

51.     Indeed, a June 28, 2016 press release issued by the NCPA described the claw back practice and how it is impacting pharmacists and consumers throughout the United States.[7] The press release went on to discuss a survey that was conducted by the NCPA of its members between June 2 and June 17, 2016, which disclosed the following:

- Copay claw backs are relatively common, as 83 percent of pharmacists witnessed them at least 10 times during the past month.

- Two-thirds (67 percent) said the practice is limited to certain PBMs.

- Most (59 percent) said they believe the practice occurs in Medicare Part D plans as well as commercial ones.

- Sometimes PBM corporations impose "gag clauses" that prohibit community pharmacists from volunteering the fact that a medication may be less expensive if purchased at the "cash price" rather than through the insurance plan. In other words, the patient has to affirmatively ask about pricing. Most

---

[6]     *See* Lee Zurik, *As United overcharges customers, execs earn tens of millions in stock*, FOX8LIVE.COM (July 18, 2016, 11:10 PM), http://www.fox8live.com/story/32472327/ zurikasunitedoverchargescustomersexecsearntensofmillionsinstock (last visited Nov. 17, 2016).

[7]     News Releases, NCPA, Pharmacists Survey: Prescription Drug Costs Skewed by Fees on Pharmacies, Patients (June 28, 2016), http://www.ncpanet.org/newsroom/news-releases/2016/06/28/pharmacists-survey-prescription-drug-costs-skewed-by-fees-on-pharmacies-patients (last visited Nov. 17, 2016); *see also Survey of Community Pharmacies*, NCPA (2016), http://www.ncpa.co/pdf/dir_fee_pharamcy_survey_june_2016.pdf (last visited Nov. 17, 2016).

pharmacists (59 percent) said they encountered these restrictions at least 10 times during the past month.[8]

52.      Some of the comments received from the pharmacists who responded to the survey included:

"Got one today. [PBM] charging a patient $125 for a generic drug and take back $65 from the pharmacy. If paid cash the cost to the patient would have been $55."

***

"Simvastatin 90-day charged the patient $30 more than cash price."

***

"[A] patient copay is over $50 and the claw back is over $30 all for a drug while our cash price would only be $15."

***

"The ones that make me the most upset is the Champ/VA claims. Seeing our disabled veterans families paying more than they should is horrific. Many times these fees are multiple times our net margin, even a negative reimbursement at times. One recent copay of $30 while we sent $27.55 back to [PLAN] left our margin at $1.58."

***

"Same patient, same day, five prescriptions. … Total copay $146.89. Total claw back $134.49. Total price of the five prescriptions $12.40. Our gross profit on these five drugs $3.79. These are all maintenance medications for this patient."

***

"Recently filled a buproprion xl 150 script for 30 tabs. Cost is $17.15. PBM required us to charge a patient $47.10 and then took back $35."[9]

53.      Clearly, these examples of claw backs could not be possible if the true cost of the prescription drug was disclosed and the pharmacy was not prohibited by contract and threat of termination from disclosing the lower cash-paying price for these drugs.

---

[8]      *Id.*

[9]      *See Community pharmacists describe PBM copay clawbacks on patients*, NCPA.co (2016), http://www.ncpa.co/pdf/06-27-16-copay-clawbacks.pdf (last visited Nov. 17, 2016).

16

## CLASS ALLEGATIONS

54.     Plaintiff brings this action individually and on behalf of the following Class (the "Nationwide Class"), pursuant to Rule 23 of the Federal Rules of Civil Procedure:

> All individuals residing in the United States and its territories who purchased medically necessary, covered prescription drugs on Defendants' formulary at any time during the relevant statute of limitations period (the "Nationwide Class Period") and paid a copayment in excess of the prescription drug's cost.

55.     Plaintiff reserves the right to redefine the Class prior to certification.

56.     Excluded from the Class are Defendants, any of their parent companies, subsidiaries, and/or affiliates, their officers, directors, legal representatives, and employees, any co-conspirators, all governmental entities, and any judge, justice, or judicial officer presiding over this matter.

57.     This action is brought, and may properly be maintained, as a Class action pursuant to Fed. R. Civ. P. 23.   This action satisfies the numerosity, typicality, adequacy, predominance, and superiority requirements of those provisions.

58.     The Class is so numerous that the individual joinder of all of its members is impracticable.   Due to the nature of the trade and commerce involved, Plaintiff believes that the total number of Class members is in the thousands and that the members of the Class are geographically dispersed across the United States.   While the exact number and identities of the Class members are unknown at this time, such information can be ascertained through appropriate investigation and discovery.

59.     Common questions of law and fact exist, as to all members of the Class, and these common questions predominate over any questions affecting only individual members of the Class.   These common legal and factual questions, which do not vary from Class member to

Class member, and which may be determined without reference to the individual circumstances of any Class member, include, but are not limited to, the following:

   a.   whether Defendants' pricing of the prescription drugs was false and misleading;

   b.   whether Defendants engaged in a scheme to inflate the copayment for medically necessary, covered prescription drugs;

   c.   whether Defendants engaged in a pattern of deceptive and/or fraudulent activity intended to defraud Plaintiff and the Class members;

   d.   whether Defendants utilized or formed enterprises for the purpose of carrying out the out-of-network reimbursement scheme;

   e.   whether Defendants used U.S. Mail and interstate wire facilities to carry out the fraudulent copayment scheme;

   f.   whether the Defendants used U.S. Mail and interstate wire facilities to carry out their conspiracy and agreement;

   g.   whether Defendants' conduct violated the Racketeer Influenced and Corrupt Organizations Act ("RICO");

   h.   whether Plaintiff and the Class are entitled to compensatory damages and if so, the nature of such damages; and

   i.   whether Plaintiff and the Class are entitled to injunctive relief.

   60.   Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and all members of the Class have been similarly affected by Defendants' common course of conduct, since they all relied on Defendants' representations in the plan contract regarding their

prescription drug coverage and paid copayments to their pharmacies based on those representations.

61. Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel with substantial experience in handling complex class action litigation. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the Class and have the financial resources to do so.

62. A class action is superior to other available methods for the fair and efficient adjudication of the present controversy. Individual joinder of all members of the Class is impracticable. Even if individual members of the Class had the resources to pursue individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed. Individual litigation magnifies the delay and expense to all parties in the court system of resolving the controversies engendered by Defendants' common course of conduct. The class action device allows a single court to provide the benefits of unitary adjudication, judicial economy, and the fair and efficient handling of all Class members' claims in a single forum. The conduct of this action as a class action conserves the resources of the parties and the judicial system and protects the rights of the Class. Furthermore, for many, if not most, a class action is the only feasible mechanism that allows an opportunity for legal redress and justice.

63. This action is maintainable as a class action under Fed. R. Civ. P. 23(b)(1) because individual actions by class members would create: (1) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants; and/or (2) adjudications that as a practical matter, would be dispositive of the interests of other class members not parties to the adjudications and would substantially impair or impede the ability of such non-party class members to protect their interests.

64.     This action is maintainable as a class action under Fed. R. Civ. P. 23(b)(2) because Defendants have acted, or refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief respecting the Class as a whole.

65.     This action is maintainable as a class action under Fed. R. Civ. P. 23(b)(3) because the common questions of law and fact identified above, without limitation, predominate over any questions affecting only individual members and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## CAUSES OF ACTION

### Count I – Violation of RICO, 18 U.S.C. §1962(c)

66.     Plaintiff realleges each and every allegation contained above as if fully set forth herein and to the extent necessary, pleads this cause of action in the alternative.

67.     At all relevant times, Defendants are "person[s]" within the meaning of RICO, 18 U.S.C. §§1961(3), 1964(c).

68.     As described herein, Defendants Cigna Corporation, Cigna Health and Life Insurance Company, and OptumRX each operated and managed OptumRX as an enterprise to carry out their pattern of racketeering activity.  OptumRX is a legal entity enterprise pursuant to 18 U.S.C. §1961(4).

69.     The Defendants utilized OptumRX for the illegal conduct described herein, but also for the legal purpose of delivering PBM services in accordance with the law.

70.     As described herein, all of the Defendants also operated and managed, as legal entity enterprises, the individual pharmacies while Plaintiff and members of the Class filled their prescriptions that were subject to Defendants' illegal scheme.

71.     Defendants utilized Plaintiff's and the Class members' pharmacies both for the illegal conduct described herein, but also for the legal purpose of facilitating prescription drug delivery services in accordance with the law.

72.     In addition, at all relevant times and as described herein, all of the Defendants carried out their claw back copayment scheme to Cigna health plan members in connection with the conduct of an association-in-fact enterprise, within the meaning of 18 U.S.C. §1961(4), comprising of Cigna Corporation, Cigna Health and Life Insurance Company, OptumRX, non-defendant insurance companies, non-defendant independent network pharmacies, and non-defendant PBMs (collectively, the "CIGNA Enterprise").

73.     Each Defendant is legally and factually distinct from each of the enterprises described herein.

74.     At all relevant times, Defendants were engaged in, and their activities affected, interstate commerce within the meaning of RICO, 18 U.S.C. §1962(c).

75.     As described herein, the Defendants have, and continue to have, an ascertainable structure and function separate and apart from the pattern of racketeering activity in which Defendants have engaged.  In addition, the members of the CIGNA Enterprise function as a structured and continuous unit and performed roles consistent with this structure.  The members of the CIGNA Enterprise performed certain legitimate and lawful activities that are not being challenged in this Complaint, including the provision of health insurance and plan and claims administration services by Cigna, which was done for many claims lawfully and without resort to unlawful practices.  However, the copayment claw back scheme was not legitimate, as it involved the artificial inflation of prescription drug amounts beyond the true cost of the drugs enabling Defendants to obtain additional monies that they otherwise would not be entitled to or

enable to obtain. Aside from legitimate activities carried out by the members of the CIGNA Enterprise, its members used CIGNA Enterprise's structure to carry out the fraudulent and unlawful activities alleged herein, including, but not limited to, intentional inflation of copayment amounts and the automatic recoupment, or clawing back, of these inflated copayment amounts from plan members' pharmacies.

76.     The purpose of the Defendants' use of the enterprises described herein was to create a mechanism by which Defendants could obtain additional monies beyond the copayments from plan members for medically necessary, covered prescription drugs. In particular, as described herein, Defendants created what appeared to be an appropriate structure between the independent network pharmacies, insurance company, and the PBMs to provide pharmacy benefits to plan members, which includes, *inter alia*, establishing a formulary of drugs that will be covered, a network of pharmacies that will serve as participating pharmacies for plan members to obtain their prescriptions, copayment amounts, coinsurance amounts, and deductibles, when, in fact, they were invalid.

77.     Through their roles in the scheme, Defendants benefited by artificially inflating the copayments for medically necessary, covered prescription drugs. Defendants further used the enterprises to facilitate its goal of artificially inflating the copayments for medically necessary, covered prescription drugs.

78.     Through its wrongful conduct, as alleged herein, Defendants, in violation of 18 U.S.C. §1962(c), conducted and participated in the conduct of CIGNA Enterprise's affairs, directly and indirectly, through a '"pattern of racketeering activity,'" as defined in 18 U.S.C. §1961(5).

79. Defendants, acting through its officers, agents, employees, and affiliates, have committed numerous predicate acts of "racketeering activity," as defined in 18 U.S.C. §1961(5), prior to, and during, the Class Period and continue to commit such predicate acts, in furtherance of their claw back payment scheme, including: (a) mail fraud, in violation of 18 U.S.C. §1341; and (b) wire fraud, in violation of 18 U.S.C. §1343.  Such predicate acts include the following:

    a.   by mailing, or causing to be mailed, and otherwise knowingly agreeing to the mailing of various materials and information, including, but not limited to, materially false and misleading copayment determinations, for the purpose of artificially inflating the amount of monies paid and each such mailing constituting a separate and distinct violation of 18 U.S.C. §1341; and

    b.   by transmitting, or causing to be transmitted, and otherwise knowingly agreeing to the transmittal of various materials and information, including, but not limited to, materially false copayment determinations and related benefit determinations, by means of telephone, facsimile, and the Internet, in interstate commerce, for the purpose of effectuating the above-described false copayment scheme and each such transmission constituting a separate and distinct violation of 18 U.S.C. §1343.

80. As set forth above, Defendants made copayment determinations, which were contrary to law and its members' contracts.  Defendants knew that the copayment determinations artificially inflated the costs of medically necessary, covered prescription drugs and that Defendants would claw back, or recoup, such amounts.

81. In furtherance of its copayment claw back scheme, Defendants, in violation of 18 U.S.C. §§1341, 1343, repeatedly and regularly used U.S. Mail and interstate wire facilities to

further all aspects of the copayment claw back scheme by delivering and/or receiving materials, including contracts, pharmacy benefit determinations, copayment determinations, and other materials necessary to carry out the scheme to defraud Plaintiff and other Class members.

82. The foregoing communications *via* U.S. Mail and interstate wire facilities contained false and fraudulent misrepresentations and/or omissions of material facts, had the design and effect of preventing Plaintiff and the Class from learning of Defendants' improper inflation of copayments, and/or otherwise were incident to an essential part of Defendants' copayment claw back scheme to defraud.

83. Defendants knew that their plan participants would reasonably rely on the accuracy, completeness, and integrity of disclosures by the Defendants.  Plan participants did rely, to their detriment, on misrepresentations and omissions from the Defendants.

84. Each such use of U.S. Mail and interstate wire facilities alleged in this Complaint constitutes a separate and distinct predicate act.

85. Plaintiff and members of the Class were injured by reason of Defendants' RICO violations because they directly and immediately overpaid for medically necessary, covered prescription drugs.  Their injuries were proximately caused by Defendants' violations of 18 U.S.C. §1962(c) because these injuries were the foreseeable, direct, intended, and natural consequence of Defendants' RICO violations (and commission of underlying predicate acts) and, but for Defendants' RICO violations (and commission of underlying predicate acts), they would not have suffered these injuries.

86. Pursuant to §1964(c) of RICO, 18 U.S.C. §1964(c), Plaintiff and the members of the Class are entitled to recover, threefold, their damages, costs, and attorneys' fees from Defendants and other appropriate relief.

**Count II – Violation of RICO, 18 U.S.C. §1962(d)**

87.     Plaintiff realleges each and every allegation contained above as if fully set forth herein and to the extent necessary, pleads this cause of action in the alternative.

88.     During the Class Period, Defendants conspired with other co-conspirators, which include other unnamed insurance companies who utilize OptumRX to engage in the claw back payment scheme, to conduct or participate, directly or indirectly, in the conduct of the affairs of the CIGNA Enterprise (described above) through a pattern of racketeering activity, as described above, in violation of 18 U.S.C. §1962(d).   This conspiracy to violate 18 U.S.C. §1962(c) constitutes a violation of 18 U.S.C. §1962(d).

89.     In furtherance of this conspiracy, Defendants and their co-conspirators committed numerous overt acts, as alleged above, in the pattern of racketeering described above, including the adjudication of pharmaceutical benefit determination and the required collection of inflated copayments.

90.     As a direct and proximate result, and by reason of the activities of Defendants and their conduct in violation of 18 U.S.C. §1962(d), Plaintiff and the Class have been injured in their business and property within the meaning 18 U.S.C. §1964(c) and are entitled to recover treble damages, together with the costs of this lawsuit, expenses, and reasonable attorneys' fees.

**Count III – Fraud**

91.     Plaintiff realleges each and every allegation contained above as if fully set forth herein and to the extent necessary, pleads this cause of action in the alternative.

92.     Defendants materially misrepresented and/or concealed the true copay prices of prescription drugs.   Defendants made such misrepresentations and/or omissions by reporting artificially inflated copay prices for such drugs to Plaintiff and members of the Class.

93.     Defendants made these misrepresentations and omissions knowingly, or at least with reckless disregard of their falsity, given that Defendants knew the copay prices that they reported to Plaintiff and members of the Class were substantially (and unjustifiably) higher than the prices that would be charged to cash-paying customers.

94.     Defendants intended to induce Plaintiff and the Class, with respect to the Class, to rely on its misrepresentations and/or omissions.  Defendants knew that Plaintiff and the Class would rely on Defendants' misrepresentations and/or omissions regarding copay prices and as a result, would pay copayments higher than the actual prices for those prescription drugs.

95.     Plaintiff and the Class justifiably relied upon Defendants' misrepresentations and/or omissions in that Plaintiff and members of the Class would not have purchased prescription drugs for more than the cash prices, but for Defendants' misrepresentations and/or omissions.  Plaintiff's and the Class' reliance on Defendants' misrepresentations and/or omissions were, thus, to their detriment.

96.     As a proximate result of Defendants' conduct, Plaintiff and the Class have been damaged because they paid copayments for prescription drugs that were far higher than the prices they would have paid, but for Defendants' misconduct.

97.     Defendants are therefore liable to Plaintiff and the Class for the damages they sustained.

**Count IV – Negligent Misrepresentation**

98.     Plaintiff realleges each and every allegation contained above as if fully set forth herein and to the extent necessary, pleads this cause of action in the alternative.

99.     Under the circumstances alleged, Defendants owed a duty to Plaintiff and the Class to provide them with accurate information regarding the prices of their prescription drugs.

100.    Defendants misrepresented and/or concealed the true copay prices of prescription drugs.  Defendants made such misrepresentations by reporting artificially inflated prices for such drugs to Plaintiff and the Class.

101.    Defendants had no reasonable grounds to believe that these misrepresentations and/or omissions were true.  The prices that Defendants reported to Plaintiff and members of the Class were substantially (and unjustifiably) higher than the prices charged to cash-paying customers.

102.    Defendants intended to induce Plaintiff and the Class to rely on their misrepresentations and/or omissions.  Defendants knew that Plaintiff and the Class would rely on Defendants' misrepresentations and/or omissions regarding copayment prices and as a result, would pay copayments higher than the actual prices for those prescription drugs.

103.    Plaintiff and the Class justifiably relied upon Defendants' misrepresentations and/or omissions in that Plaintiff and the Class would not have purchased prescription drugs for more than the cash prices, but for Defendants' misrepresentations and/or omissions. Plaintiff's and the Class' reliance on Defendants' misrepresentations and/or omissions were, thus, to their detriment.

104.    As a proximate result of Defendants' negligent conduct, Plaintiff and the Class have been damaged because they paid copayments for prescription drugs that were far higher than the prices they would have paid, but for Defendants' misconduct.

105.    Defendants are therefore liable to Plaintiff and the Class for the damages they sustained.

**Count V – Breach of Fiduciary Duty**
**Under ERISA 29 U.S.C. §1132(a)(2)**
**(Against Cigna Corporation and**
**Cigna Health and Life Insurance Company)**

106.    Plaintiff realleges each and every allegation contained above as if fully set forth herein and to the extent necessary, pleads this cause of action in the alternative.

107.    Section 502(a)(2) of the Employee Retirement Income Security Act of 1974 ("ERISA") authorizes plan participants to bring a suit for appropriate relief under 29 U.S.C. §§1109, 1132(a)(2).  Section 1109(a) of ERISA provides:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

108.    Here, Cigna served as a fiduciary for the plans.  As such, it owed the plans and the plans' participants a duty to act with undivided loyalty when managing and administering the plans.  Cigna also owed the plans and the plans' participants a duty of prudence.

109.    Cigna breached its duty of loyalty and prudence under ERISA by engaging in the conduct described in detail in this Complaint.  Among other things, Cigna breached its duty of loyalty and prudence by misrepresenting and/or concealing the true copay prices of prescription drugs and reporting artificially inflated prices for drugs to Plaintiff and the Class.

110.    As a result of the wrongful conduct alleged herein, Plaintiffs and the Class paid higher copayments for medically necessary, covered prescription drugs, causing them to suffer damages in an amount to be determined at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment against Defendants as follows:

A.      That the Court certifies the Class, under Fed. R. Civ. P. 23, appoints Plaintiff as Class Representative, and appoints his attorneys as Class Counsel to represent the members of the Class;

B.      That the Court declares that Defendants' conduct has violated, and continues to violate, the statutes and laws referenced herein;

C.      That the Court preliminarily and permanently enjoins Defendants from conducting business through the untrue, misleading, or deceptive business acts or practices and other violations of law described in this Complaint;

D.      That the Court orders Defendants to implement whatever measures are necessary to remedy the untrue, misleading, or deceptive business acts or practices and other violations of law described in this Complaint;

E.      That the Court orders Defendants to notify each and every individual, who paid a copayment for medically necessary, covered prescription drugs above that prescription drug's cost, of the pendency of the claims in this action in order to give such individuals an opportunity to obtain restitution from Defendants;

F.      That the Court orders Defendants to pay restitution to restore to all affected persons all funds acquired by means of any act or practice declared by this Court to be an unlawful, unfair, or deceptive business act or practice or in violation of law, as described in this Complaint, plus pre- and post-judgment interest thereon;

G.      That the Court orders Defendants to disgorge all monies wrongfully obtained and all revenues and profits derived by Defendants, as a result of their acts or practices, as alleged in this Complaint;

H.      That the Court awards damages to Plaintiff and the Class;

I.      That the Court enters an Order awarding costs, expenses, and reasonable attorneys' fees; and

J.      That the Court grants such other and further relief as may be just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury for all issues so triable.

DATED:  November 17, 2016                    **SCOTT+SCOTT,**
                                             **ATTORNEYS AT LAW, LLP**

                                              /s/ *Joseph P. Guglielmo*
                                             Joseph P. Guglielmo (CT 27481)
                                             The Helmsley Building
                                             230 Park Avenue, 17th Floor
                                             New York, NY 10169
                                             Telephone:  212-223-6444
                                             Facsimile:  212-223-6334
                                             jguglielmo@scott-scott.com

                                             Erin Green Comite (CT 24886)
                                             **SCOTT+SCOTT,**
                                             **ATTORNEYS AT LAW, LLP**
                                             156 South Main Street
                                             P.O. Box 192
                                             Colchester, CT 06415
                                             Telephone:  860-537-5537
                                             Facsimile:  860-537-4432
                                             ecomite@scott-scott.com

                                             Andrew A. Lemmon
                                             **LEMMON LAW FIRM LLC**
                                             P.O. Box 904
                                             15058 River Road
                                             Hahnville, LA 70057
                                             Telephone:  985-783-6789
                                             Facsimile:  985-783-1333
                                             andrew@lemmonlawfirm.com

                                                    - and -

                                             650 Poydras Street, Suite 2335
                                             New Orleans, LA 70130
                                             Telephone:  504-581-5644
                                             Facsimile:  504-581-2156
                                             andrew@lemmonlawfirm.com

E. Kirk Wood
**WOOD LAW FIRM, LLC**
P. O. Box 382434
Birmingham, AL 35238-2434
Telephone:  205-908-4906
Facsimile:  866-747-3905
ekirkwood1@bellsouth.net

Greg L. Davis
**DAVIS & TALIAFERRO, LLC**
7031 Halcyon Park Dr.
Montgomery, AL 36117
Telephone:  334-546-8838
Facsimile:  334-409-7001
Gldavis@Knology.net

Brian C. Gudmundson
**ZIMMERMAN REED, LLP**
1100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone:  612-341-0400
Facsimile:  612-341-0844
brian.gudmundson@zimmreed.com

Brad J. Moore
**STRITMATTER KESSLER WHELAN
KOEHLER MOORE KAHLER**
3600 15th Avenue West, Suite 300
Seattle, WA 98119
Telephone:  206-448-1777
Facsimile:  206-728-2131
brad@stritmatter.com

*Attorneys for Plaintiff Daniel Perry*